ON RECORDS Sacon temporary schedule the morning my name is Timmy and I do represent Oswego Community Unit District number 308. The following facts in this case are uncontested. Jeffrey Stewart collapsed in teacher Stacy Harper's English class at Oswego High School in February 2008. Harper rushed to Jeffrey's side, saw that Jeffrey was convulsing and assumed he was seizing. Harper therefore rolled him on his side to prevent him from swallowing his tongue. He immediately sent students to get the school nurse and he stayed by his side to comfort him until the nurse arrived and started CPR. CPR was continued on Jeffrey Stewart until the paramedics arrived. The jury found that Harper showed utter indifference and conscious disregard for Jeffrey because Harper did not call 911 within the first two minutes because according to plaintiff's expert, Dr. Stewart had resuscitated had 911 been called within the first two minutes of his collapse. The jury awarded $2.5 million. As this court is well aware, Section 2-10 of the Tort Immunity Act defines willful and violent conduct as showing utter indifference or conscious disregard. And this statutory willful and wanton definition applies when there is immunity being sought under the act. In determining what constitutes utter indifference to or conscious disregard of another's safety, case law in the teacher-student medical context has examined whether the defendant did something to aid the plaintiff that quote, evinces concern for the student's safety. Cases that support this standard are Stiff, Mitchell, and Belima, which we've cited in our brief. Plaintiff argues a common law standard, which was applied in the Murray case, which did not apply under the 1998 amendment because the event occurred prior to that amendment. That willful and wanton conduct may be proved where there's been a failure after knowledge of impending danger to exercise ordinary care to prevent the danger or failure to discover the danger through recklessness or carelessness when it could have been discovered. But the incident here occurred after the act. In the appellate court in the first district, in Thurman in the fourth district, and Belima in the third district have said that the willful and wanton definition in the Tort Immunity Act applies after 1998. And to the extent that it is inconsistent with common law, it applies. But under either test, Your Honors, we believe common law is more statutory in a student-teacher medical emergency context. The analysis has been whether the teacher has events concern for the safety of the student. Mr. Eden, you cited the Belima case, Mitchell, and Stiff, and the plaintiffs cite the Abruzzo case, the Kerwin case, and the other two cases, is the cases cited by plaintiff are cases that had policies that were violated. And wasn't there a policy in this case at the school? Yeah, in the opposite of your cases you cite, there was no policy with respect to those actions. Two things, Your Honor. First of all, there was a faculty handbook which said that you were to contact the nurse's office, which he did. Would it make a difference between the type of event, right? It could, because I think there was also another policy. That said serious illness, contact the nurse's office. There was also an emergency plan which said in the matter of life and death, you were to call 911. And that's a discretionary call. But isn't that the basis for calling the nurse first because she's probably or he's probably the one that has the ability to make that determination? And that's what Mr. Harper said in his testimony, Your Honor. He said, I'm not a medical person. I needed someone to tell me whether this is something that could be handled here before I call 911. Nurse Banbury came in, saw the student, immediately started CPR. But, Your Honor, if I could further answer your question. Our three cases deal with teachers. The three cases that are cited by the plaintiff, the three that you cited, dealt with medical emergency responders. In the first case, the American Bank v. City of Chicago case, it dealt with a 911 operator and paramedics. Curlin dealt with paramedics. The Bruzo case dealt with paramedics. That was under the Emergency Services Act, which has Wolflin 1 as an exception, but no definition. And they hold them to a higher standard. We have a teacher here, not a doctor, not a paramedic, not a nurse. And therefore, to suggest that because the teacher didn't properly diagnose that this student was suffering from something where 911 should have been called, it does not show utter indifference. And it's not at the same standard that you would have in a paramedic context. Does the fact that he's gasping for air, does that change your thoughts about that at all? No, Your Honor, it doesn't. First of all, he was gasping for air. There's definitely evidence in the record about that. And he was also severely convulsing and shaking. What did the teacher do when he saw this? Jeffrey Stewart stood up and collapsed. He rushed over there, according to the testimony of Jacob Pellegrini, pushed Vest aside, went to his side, rolled him over because he was afraid he might be swallowing his tongue, and he thought he was seizing. Was he right? Well, here's the thing. If he thinks that, how can he also think that this is not a serious medical emergency for which he is obliged to call 911? But, Your Honor, he isn't. Under the faculty handbook, which he said he was following, he decided to call the nurse to determine what needs to be done. That's the point. He didn't call the nurse. He sent a couple kids down to the nurse's office. He saw two students, and he testified. He testified at trial. The reason he did that was it was definitely faster, in his opinion, to send the students to the nurse's office than to call because, in his experience, she doesn't always pick up the phone. So, if you look at the allegations of the complaint, they didn't respond quick enough. They didn't diagnose it quickly enough. Those are in the negligence count, which was dismissed. If you look at count two, which is willful and wanton, it's exactly the same conduct except now it says willful and wanton. There is no difference here. Was he negligent? I would argue he wasn't. But even if you assume he was because he made the split-second decision, because of his experience with calling that phone, to send students to the nurse's office. Why not do both? If he can yell at a student to run down the hall, why not say to a student, start calling the nurses off? Isn't that the whole point here is that it's the time that elapses between when this young man collapses and when the paramedics finally, finally, finally get to the classroom? Your Honor, the answer is yes. The time is important. In fact, the testimony of the plaintiff's expert said that he had 911 to call within the first two minutes, assuming they would have arrived there within six minutes. Now you're at eight minutes that perhaps they could have resuscitated him. But isn't the six-minute issue, though, because that timing was the paramedics coming to the front door because no one, when they were ultimately called, nobody knew what was the closest door to the classroom? Right. So isn't six minutes somewhat inflated? Well, Your Honor, all I know is that what he said in his testimony was that he believed the proximate cause was the fact that there had been no calling of 911 within two minutes. And it's that two-minute framework that he argued both in opening and closing and to the jury. He was focusing on that two minutes. So what happened during that two minutes? Mr. Harper went to his side and stayed at his side to comfort him during that whole time while they were fetching the nurse until she came back and started CPR. So my question to you is, based upon those facts, does this demonstrate utter indifference, a conscious disregard for Jeffrey Stewart? Are you asking us this in the context of a denial of a grant of summary judgment or the jury's verdict? The jury's verdict, Your Honor. And the three cases that we cited that you mentioned, Stiff, Mitchell, and Belima, were all decided as a matter of law. Stiff was a directed verdict. The other two were summary judgments. And in those cases, the court found that as long as the teacher did something, and they pointed to cases where there was a failure to do anything that would warrant willful and want, but as long as there was something done. So the question is, is he negligent? And again, I would argue he's not. But the issue is, was his conduct willful and want? In rushing to this student's side, in trying to comfort him, in rolling him over to protect him from swallowing his tongue, sending students to get the nurse, and then the nurse performing CPR, does that constitute willful and want? How about if the jurors heard other things that, for instance, the young man had in his pocket the inhaler. Nobody checked for an inhaler. Or the fact that I think they're going to judge the credibility of the witnesses, too, with respect to timing, with respect to everything you had. One witness, I think it was the other nurse, something to that effect, where she was contradicted by a lot of testimony. The mom didn't answer. The aunt said that he didn't own an inhaler, and then there was one in their pocket. There were no medical records concerning his asthma, and then it turned out that there was an e-mail to Harper with respect to the asthma, which contradicted that. So all of those things, the totality of all of that testimony, wouldn't that be enough to allow the jurors to make a determination that the plaintiff met their burden? Respectfully, Your Honor, no. And the reason is, the case that the two minutes, because outside of that two minutes, then the timing doesn't work in terms of the doctor's testimony. He said that if they had been called 911 within that two minutes, then there would have been an opportunity to resuscitate. That's the argument that was made to this jury, not what happened after the two minutes. Well, no, but what happened before would certainly give them a heads up as to what to do within those two minutes, wouldn't it? So if this individual, as he said, had he been told that this young man had asthma, perhaps he wouldn't have thought he was having a seizure, and perhaps he would have proceeded differently. It's possible, but the evidence was that it was the urgency to perform CPR, and there was no evidence that I'm aware of in the record that said if he'd only used the inhaler, it would have made a difference. Now, was there an expert that testified to that? I thought there was an expert that testified to that. They said that the teacher, if he'd known it was asthma, perhaps could have gone to the inhaler, but the testimony that they relied upon was that there had to be action to call 911, and it was the ability to resuscitate him using CPR that would have made the difference, not if they had used the inhaler. And again, Your Honor, under the standards that have been set by this Court, and look at the Murray case, which talked about the 1998 amendment to the Tort and Immunity Act, and if you look at the legislative history in that, I think it was Representative Dart, who was in the House at that point, was saying that any common law inconsistent with the utter indifference standard is no longer in effect, and that's what the utter indifference and conscious disregard standard, based upon what Mr. Harper did in that two minutes, willful in one, was not met. So you're saying it was against the manifest way of the evidence? No. What I'm saying, because I'm not arguing for a new trial, I'm saying there should be J and a V, and what I'm saying is that as a matter of law, as they held in Mitchell and Bolema and Stifel, that this did not constitute utter indifference of conscious disregard. And in terms of his actions, I think you have to focus on what's uncontested, because Justice Shostak, you pointed out rightfully so, that there was some dispute about the timing, there was some dispute about whether he knew or didn't know about the inhaler. Putting those contested issues aside, because the jury had the right to decide how they decided, it's the uncontested facts that show, in my opinion, as a matter of law, that there was no utter indifference and conscious disregard to Jeffrey Stewart by this teacher, because to impose liability on the school district for a teacher who followed the faculty handbook by sending someone to get the nurse, by going to the child's side, that doesn't show utter indifference. In fact, Jacob Pellegrini testified, who was one of Jeffrey Stewart's best friends, he said that Mr. Harper went to his side to provide comfort and to prevent him from dying. This is what he did. It's not unlike the teacher's initials. That's where we get back to the question. If he was preventing him from dying, it was a life and death situation. And that's the fork in the road that I have difficulty with. Well, seizing may or may not be a life or death situation, and heavy breathing may or may not be a life situation. But, Your Honor, I wouldn't know that, and I don't think a teacher would know that. What this teacher saw was heavy convulsions, some breathing difficulties, there's no question about it, and he decided to get the nurse to decide what should be done, because the faculty handbook said, call the nurse whether it's a serious illness, which there was, and those are his actions. And to suggest that somehow, towards Jeffrey Stewart, that's showing utter indifference and conscious disregard of his safety? He was doing everything he thought was appropriate. This is not a paramedic, this is not a 911 operator, this is not a doctor. I'm going to keep you up here just for a few minutes. Of course. I want to just address the jury instruction. I think one of the issues that we had with the jury instruction was the word prevent. Yes. We've just been talking about the word prevent. So how is it now that it was not adequate for your jury instruction? Well, because we believe that there was no conduct here that would show that they prevented him from getting adequate medical care, because he sent for the nurse, they performed CPR. How was that preventing, other than would it have made a difference if they had called 911 earlier? How was he to know that? I mean, there was no indication here that he was being prevented from having proper medical care. In hindsight, perhaps. I'm sorry. In hindsight, perhaps, we could say, well, maybe he should have done this, maybe he should have done that. This is a schoolteacher responding just like the schoolteachers did in the Mitchell case when the child choked on a cupcake, I believe, and they didn't call 911, they called the nurse, he had severe injuries subsequently, and the court said, we're not going to second guess what a teacher thought was the proper thing to do. They went to his aid immediately, and that's what we have here. Did you submit an alternative instruction? No. We objected to it, and the only thing that we could have done differently was perhaps cross out the first, prevented him from getting medical care. That was not done because they thought that would be futile, the judge had already ruled, so there was a clear objection to it, but an alternative instruction was not submitted. Okay. Thank you, Mr. Reed. We'll have an opportunity to talk about that. Mr. Skafish? Yes. Thank you. May it please the Court. Closing counsel. I know some of the points raised in the briefs were not necessarily talked about. I'll try to make a brief commentary, even on the ones that weren't brought up. One of our first points was that in appealing the order denying the motion for summary judgment on the issue of Willful and Wanton due to the alleged immunities, we believe that that argument was waived by not being included in the notice of appeal. I'm not going to devote a lot of time to this because it wasn't addressed by my opposing counsel, but the notice of appeal merely mentioned appealing the jury verdict and the order denying the post-trial motion. We've cited the Magat versus Price case for the proposition that while there is an exception for a procedural progression, that means more than just temporal succession, so it doesn't mean I've appealed the jury's decision, so everything that comes before that is also in play. I think I asked him if he was talking about that and he said he was not. The bigger issue with the arguments as to the denial of the Willful and Wanton summary judgment on the immunity issue is that that would have merged with the jury's verdict and become not appealable under the Belleville case and all of its progeny. The general rule is that an order denying a motion for summary judgment will merge with the judgment and not become appealable for the obvious rationale that if the court found there were still outstanding fact issues and then after a full presentation of the facts before the jury, the jury makes its decision, it wouldn't be reasonable to go back then and revisit the issue on the less full version of the facts that the trial court had at the summary judgment stage. This is important because... I think I asked him if he was talking about summary judgment and he said no, he was talking about the jury's verdict. I don't dispute the main points he was raising there. They're raised in his brief and I just don't want to leave out a whole section. I'll try to move on quickly. If the court views that that hasn't been waived here, all the better. But I just don't want to be remiss and fail to address something. They say in the brief that discretionary immunity can be a question of law. Well, it can be. It can also be a question of fact and that's exactly what the court found here, that there were remaining fact issues. And while we cited several cases, the Van Meter case where there were policy decisions, that was a fact issue. What do you say to Mr. Eaton's argument that in the cases that you cite, as I pointed out, there were policies that were violated? And to that, he responds, well, those individuals were all medical professionals. And in the cases he cites, they weren't medical professionals. Therefore, he held to a different standard. What's your response to that? And you're talking now on the American Kirwan and Abruzzo cases versus the BLM case. Well, I think, one, you keyed in on an important distinction that there were policy decisions that were made that were different. And that's exactly what we have in our case. There was both the handbook that dictated what should be done generally in a health situation, but also the express provision that under life and death circumstances, you need to call or have someone call 911 immediately. And that's actually fleshed out further, which I may address in a minute. But there's another important distinction that I think also shows why the cases cited by the plaintiff, the appellee here, in terms of control, all of the cases cited in our briefs concern dealing with what might constitute willful unwanted in dealing with an emergency health situation. Is that a different standard than what we're talking about here for a non-medical actor? I don't believe so. I think the defense of the appellant here is kind of conflating two issues. There's, one, the issue of whether an immunity applies. And there's, two, the issue of if the immunity doesn't apply and it becomes a jury question whether there was willful unwanted conduct, what's the standard? I will contest that the standard for willful unwanted conduct, as was applied by the trial court and found by the jury, is the utter indifference, conscious disregard. There may be different standards, and are, as to whether a paramedic gets an immunity or a teacher. But once you're over that threshold, the law on what constitutes willful unwanted is the law of Illinois. And I don't think we have a disagreement there, although I know he disputes some of the cases we've cited. The big difference between our set of cases and theirs, we have a 911 operator in the American National case not keeping the heart attack victim on the line. The Supreme Court held that there is a jury question as to willful unwanted. In the Kerwin case, they found that the complaint stated the cause of action where the paramedics were alleged to have failed to provide treatment after allergic reaction for seven to eight minutes. Again, that's very much on point as we have delay in a time period. And then in the Abruzzo case, the court affirmed a jury verdict. So we proceed to the same point that we are, where the paramedics didn't transport the decedent right away and ended up dying by the time he was transported. Again, a delay. Now, I know they'll say that their cases had to do with teachers, but look at the context. It's completely different. In the Bielema case, it's a slip and fall. We're not talking about dealing with an existing health crisis and whether you dealt with it appropriately. They're talking about whether the school could be found willful unwanted for allowing the kid to slip on a puddle of water. That's a very different situation, and I just don't see how it can be used as having nearly the precedential value as what we've said. The Stiff case, you have, again, a slip and fall, a seven-year-old epileptic on a field trip. Whether what the school did to keep him from falling was enough. And finally, the Mitchell case, which I think I need to give some special time to. It's argued in the brief, and I think it was just argued orally by counsel, that the issue there was calling the nurse instead of calling 911. I think you'll agree that's not my reading of the case at all. The issue there was whether the school had done enough to keep a kid who had a known swallowing problem from stuffing a cupcake in his mouth. That was the issue that went to the court on whether or not that could be considered willful and unwanted conduct. The student was known to have a problem with swallowing and kind of impulsively putting food into his mouth. The teachers knew about that. They were watching over him. Didn't they cut the cupcake up? They cut a cupcake up first, then the student evidently made a mess with that. And for a brief period of a few seconds, the teacher went to get materials to clean up that very mess that the student had created. In that time, he grabbed another cupcake that hadn't been cut up. That's a highly different situation where the willful and wantonness that was alleged there and found lacking was the failure to supervise him for the mere few seconds while they were cleaning up his own mess, not the way that they addressed it after the fact once the health crisis happened. So I just don't think the cases cited by the defense are on point on the issue here of what is or is not willful and wanton conduct. Do we take into consideration in determining willful and wanton, and was it proper for the jury to take into consideration the totality of the case, or as Mr. Eaton points out, is it just within those two minutes? I think it's absolutely the totality, as you pointed out before, because you can't separate the two. It's not just the two minutes. It's everything that led up to the two minutes. The facts that are undisputed here are the school had an awareness of asthma. The school had emailed that information to the teachers, and the teachers were expected to be familiar with it and to act upon it. According to Jill Weber, the health care coordinator, he would have been aware. So either he was and neglected what he knew, or he wasn't because he had not followed through on his duties. The teacher then sees the breathing problem, the collapse, and then we get into that issue of a life or death situation. The counsel says, well, you know, he can't know. He did his best. The school's own crisis plan says under life and death circumstances, call or have someone call 911 immediately. Be prepared to provide the school name and address, exact location, room, floor number, describe the illness or type of injury, and the age of the victim. And as we saw here, he didn't call. He had somebody run to the nurse. When they came back and was told again, you need to call the nurse. This kid's not breathing and he's not going to let go. The crux of it is, does the teacher know it's a life and death situation? How could he not? We're not talking about the kid says, you know, Mr. Harper, I don't feel that great. I think I need to go to the nurse. Or I've got this issue where then somebody might see that it's life and death. Somebody else might see it. I just thought he wasn't feeling well. If the school can employ a plan called under life and death circumstances, what more could happen for them to expect a teacher to recognize life and death than collapsing, falling to the floor, difficulty breathing, and convulsing on the floor? Any more and he's already dead. It's no longer life and death, it's just simply death. That seems to me to be exactly the situation that the school has predetermined. When that happens, you need to call 9-1-1. It wasn't just in the plan, it was testified to by other witnesses that were school witnesses that they knew that was the plan. Under life and death, you have to call 9-1-1. That same paragraph also says administer appropriate first aid according to your level of training until help arrives. He had some training, I thought, in CPR. There was evidence that he was trained in CPR and didn't attempt to use it. He didn't make any justification for why he did so. Again, I think, as Justice Shostakovich brought up, that goes into the totality of it. The delay is huge, and the delay is something that was keyed in upon by plaintiff's expert, but it's not the sole exclusive point of evidence that the jury can use to determine that there was utter indifference or conscious disregard. You've got a teacher who doesn't call 9-1-1, despite the plan saying he should. You've got a teacher who knows CPR but doesn't attempt to administer it. You've got a teacher, once he's told you need to call 9-1-1, he still kind of farms that out by once again calling the nurse's office and saying, have someone call 9-1-1. Does that matter, then, because Weber doesn't know where the student is in the school, where that particular classroom is, so she has the paramedics come to the front door? Right. And as you keyed in on before, that's why. We were kind of stuck with the six-minute estimate, but that may very well be inflated because, again, under the emergency plan, yes, it says give the exact location. When she got the information, she didn't know who was calling because he didn't identify himself and believed it was a student. She didn't know what the situation was with the student that was being reported, and she didn't know the exact location. So we've got an inflated amount of time to get there, and even with that amount of time, the expert was still able to say, using that six minutes as if it's the gospel and we can't change it, there was still ample time to have called. As the panel has already pointed out, if the teacher thought, these phones don't always get picked up, I'll send some students, great. Then make the call because maybe this is the time they will pick up. That's the system the school has in place. And again, the school is the defendant, not Stacey Harper individually. If the system doesn't work because nobody adheres to it, that's, again, a problem, and it goes into the totality of circumstances as to whether you can hold the district responsible for utter indifference, conscious disregard. Is there any evidence in the record as to whether or not from an individual classroom you can get an outside line to call 911? I mean, eventually it was used. The line that's in the classroom is able to call 911 and ultimately was used to make an outside call. There were also numerous people in the room that had cell phones, but I don't think you need to get to that when there was a system in place that didn't necessitate getting to people's private phones. Counsel brought up Jacob Pellegrini, the student who said, but the teacher went to his side to prevent him from dying. Again, I think as the panel has said, it's evidence that he did view this as a life and death situation and didn't discharge the duty he had then. It's also self-serving to come back and argue that a student who doesn't have medical training can say, well, I think what he did, he came to his side. He did something that's good enough. And that was, I think, one of counsel's explicit arguments that according to his reading of case law, if they did something, well, then that's enough to say that it's not utter indifference or conscious disregard. That's not the law. Can we glean from this if a high school student appreciates that this was life and death, it would seem prudent that a teacher would? I certainly think that's a reasonable reading. I think what we can glean from it is the teacher did know, or his other conduct indicated that he knew that this was very serious. He didn't treat it like a kid who came in with a sprained ankle or a kid who says, I've got bronchitis, I'm having trouble with this or that being in pain. He knelt down there by him and thought, this kid's in serious trouble. But he didn't do what he was required to do and what I think everybody in this room would expect a five-year-old to do. If somebody falls down and can't breathe, you call 911. That's one of the first things most people teach children about emergencies. I know we're treating this like, well, hindsight's 20-20, and a lot of times when somebody dies, you look back and think of the things you could have done that might have been different, but you didn't know in the heat of the moment. I understand that, but we're not talking about something unusual that took any medical training or expertise or great intellect. We're talking about calling 911, which anybody knows. Did this young man have an IEP? He did, and that's also part of the totality of circumstances. He had an IEP, and that should have been known, and that also indicated asthma. Everything indicated asthma. The coroner's report indicated this was a death by asthma, which I don't think that's been disputed in this forum, but it was disputed in trial, and I think that argument was rejected by the jury. A counsel argued that we are applying the wrong standard. I think, again, that's a misrepresentation. We have cited the Murray case. The Murray case is a 2007 Illinois Supreme Court case decided after that 1998 clarification, which I don't think does away with or applies a different standard regarding willful and wanton. It merely flushes it out with further language. To say that willful and wanton is defined as utter indifference or conscious disregard is the standard, and it was applied at trial, but for the Supreme Court to further flush that out with a little bit more language doesn't mean that they're throwing that standard out. And let's remember, this is a nine-year later case. Can I make just one final point? No, sure you can. I guess just getting down to the practical human elements here. The Stewart family lost a son. They patiently waited seven years for this case to go to trial. They had their day in court. The trial was fair. It wasn't trial right with objections and sidebars and constantly having problems getting the flow of the trial. It was as fair as any trial could be. There may be no perfect trial, but this is as close as you're going to get in a very serious situation like this. Let me ask you. I don't mean to cut you off. But let me ask you, because I asked Mr. Eaton briefly about that jury instruction issue that he raised. And with respect to the word prevent. He's indicating that that was not fair to bring that word, prevent, into the jury instruction. And I appreciate that they didn't object. They objected that they did nothing to, let's say, perfect the record. They didn't tender an alternative. Didn't tender an alternative. Didn't scratch it out as Mr. Eaton said they probably could have. What is your response to his argument concerning that jury instruction? Sure. Well, yes, of course, we think there's a problem that they didn't tender an alternative. But getting to that issue, the defense argues that prevent can only be defined or understood as to stop from happening. As we pointed out in our briefs, that's a very narrow definition. Prevent can also be defined as hinder, impede, hamper, obstruct, inhibit. And all of those things, I think, are exactly on point with what Mr. Harper did. By taking the action and course of inaction that he did, it inhibited the appropriate course of action from happening or anybody else from saying, you know what, I think this is what I should do. But you know what, that adult who's the authority figure has already taken another action. I guess I'll defer to what he's doing. But to the bigger point, this is something that was alleged by the plaintiff. And the judge, Judge McCann, in looking at it said, I think this is a major part of their argument. If the defense position is there was no evidence that he prevented Jeffrey from getting medical care, then it's not presidential to simply instruct the jury that the plaintiff is arguing that. By analogy, I would compare this to imagine you have your garden variety auto negligence case and the plaintiff says the defendant was speeding. Well, if the defense position is there was never any evidence of that, then simply letting the jury know that the plaintiff has alleged that the defendant was speeding doesn't prejudice them one way or another. It simply informs them this is one of the allegations being made. If anything, if the jury thinks, boy, they're waiting. Instructions must be based on the evidence, not the allegations. If their reading is there's no evidence, our reading is there is. And that's become the fact issue. If your position is I don't think there was any evidence of that at all, well, then your case ought to look pretty strong in front of the jury who presumably would agree with you if there really was no evidence. But here the jury heard that instruction as well as the alternate and still found that there was evidence. So I don't see how there could be prejudice certainly for what is suggested. OK, thank you. Finally, just to finish. A jury of 12 people in Kendall County, not a jurisdiction that's wildly liberal or known for throwing out large plaintiff's verdicts whenever they're put before it. Is that in the record? Probably not. We know it's a Kendall County jury. I just undoing the hard fought war eight years after this on behalf of the plaintiff I think would be a major disservice and a tragedy of justice. I have one additional question. Defense raises an argument about policy and that the decision in this case sets a bad precedent for future school policies. And I know that's somewhat of an open ended question, but what is your response to that? What is your thoughts as to overarching policy concerns? Right. And I would point out they devoted a couple of pages of their brief to that, but there were no citations to anything. It's simply their own argument. But I would like your response to that argument. I don't see why that would be the case. I think there may be some other cases where it's really difficult to tell how to deal with a health emergency, but one where somebody falls down, convulses and can't breathe, expecting that 911 should be called. I don't think that moves the bar. I think that's within the law as it exists. Willful and wanton cases by their very nature are very fact sensitive and come down on both sides, both at the trial level and on the summary judgment level and on the pleadings. Because the specific facts of what happened are different in every case. And I don't think upholding the verdict in this case that would be appropriate changes anything for schools. I don't think the average school district or teacher would say, now, boy, I knew what I had to do before, but now I'm not sure how. We're going to have to change our policies on how to deal with somebody falling down. A reasonable human being would already understand that when somebody falls down, not breathing, convulsing, calling 911 is reasonable. And that doesn't set too high of a bar or an unreasonable standard. Thank you. Thank you. Mr. Reardon. Justice Jorgensen, let me address your question on policy. I think you would be making policy if you affirmed this verdict. I appreciate the fact that 12 people heard evidence. I appreciate the fact that they called it as they saw it. But the cases that we've cited that have dealt with a teacher-student medical emergency in that context have all said that the teachers are not the guarantors of that student's safety. But they do have to do something to evince a concern for the safety, and they did in those cases. Were those cases really medical emergencies, though, or just an injury that occurred? Certainly Mitchell was a medical emergency, Your Honor. When the child choked and they did the Heimlich maneuver, and counsel said I misstated the facts in that case. Reading from the case. Well, I think he suggested that he draws a different takeaway from that case than you cited. But it's plain in the facts that the nurses were called at the school first. And when they were unable to do anything successfully, they then called the ambulance. So we were pointing out the facts are very similar between Mitchell and our case. And Your Honor's also asked questions about what more could he have done? Shouldn't he have done this? Shouldn't he have done that? And, you know, we did cite the Belima case. And counsel says, well, that's a slip and fall case. Well, the definition of willful and want does not depend on the severity of injury. There's never been any suggestion that the definition would be different. And in that case, if I can quote from the case, furthermore, the actions of the district employee do not demonstrate an utter indifference or conscious disregard for the safety of others. Kathleen took action to remedy the danger posed by the spill, which was to have a teacher stand by the puddle and warn others of the danger, indicating a clear concern for the safety of others. And while it seems Lynn, who was the teacher, could have done more to warn Erica of the spill, his mere ineffectiveness does not show a course of action demonstrating the district was utterly indifferent or consciously disregard the safety of others. And Justice Shostak, you've asked me and you've asked counsel, does it make a difference if we're talking about the totality of the circumstance versus what I've said? Well, here's what counsel argued to this jury. If a call to 911 could have been made in the first two minutes, it's more likely than not that Jeffrey Stewart would still be with us. Closing arguments. It was more probably true than not that if a call had been made within the first two minutes of the collapse, Jeffrey would still be here. Post-trial brief. Jeffrey more than likely would have been resuscitable if the call to 911 has been made within the first two minutes. He was arguing approximate cause. I mean, let's get away from liability. His witness, his only witness that testified, said if that call had been made within the first two minutes. That's the conduct that we're talking about here, the established approximate cause. In other words, no witnesses said, well, if you look at everything the hospital had done, it would have saved Jeffrey's life. It was had he called within the first two minutes. And that's what we're dealing with. Could more have been done within the first two minutes? Sure. Is that ineffective? Maybe. Is that willful and one conscious disregard? My answer would be no. Counsel mentioned the Murray case and whether or not there would be a different standard. Correctly pointed out, it was decided in 2007. But sometimes decisions take a while from the initial event. Here's what Murray said. Go ahead and give me your opinion. Defendants acknowledge that the 1998 amendments to the Tort Amnesty Act were not in effect at the time of Ryan's accident. Therefore, the legislative intent of the 1998 amendments is not properly before this court. And it would be inappropriate for the court to consider the legislative intent in passing legislation that was not even in effect at the time of Ryan's accident. So that court was looking at common law standards. It was not looking at the specific statutory provision, even though it was decided in 2007. And, in fact, in Harris v. Thompson, 2012, it's still been decided. But the appellate court has had that kicking around in several cases. Thank you very much. And we respectfully ask that this court find, as a matter of law, that the conduct here was not willful and one or, alternatively, a new trial based upon the faulty instruction in our opinion. Thank you. Thank you. Thank you, gentlemen, for your arguments here this morning. These are the types of arguments that keep us coming back to our job every day. Very interesting. Very professional. Thank you so much for your time. The decision will be rendered in due course, and you will get a decision written shortly. And, in the meantime, we're going to take a quick recess before we begin our next case. Thank you so much. Safe travels back, gentlemen.